UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

STOCKHAM INTERESTS, LLC,
A New Jersey Limited Liability Company,
and
10 ENTERPRISES, LLC,
A Pennsylvania Limited Liability Company,

      Plaintiffs/Petitioners,

v.                                                            No. _____

THE BOROUGH OF MORRISVILLE,
A Political Subdivision of
the Commonwealth of Pennsylvania; and
THE BOROUGH OF MORRISVILLE
ZONING HEARING BOARD,

      Defendants/Respondents.

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## COMPLAINT FOR DAMAGES
## PETITION FOR ON THE RECORD REVIEW OF
## THE DECISION OF THE MORRISVILLE ZONING HEARING BOARD
## COMPLAINT FOR ATTORNEY'S FEES

COME NOW, Plaintiffs, STOCKHAM INTERESTS, LLC. a New Jersey Limited

Liability Company and 10 ENTERPRISES, LLC., a Pennsylvania Limited Liability Company,

whom, for their cause of action against THE BOROUGH OF MORRISVILLE, a Political

Subdivision of the Commonwealth of Pennsylvania and the BOROUGH OF MORRISVILLE

ZONING HEARING BOARD, would state as follows:

### I. PRELIMINARY STATEMENT

1.      This is an action brought by Plaintiffs, STOCKHAM INTERESTS, LLC., a New Jersey

Limited Liability Company, and 10 ENTERPRISES, LLC., a Pennsylvania Limited Liability

Company, for declaratory and injunctive relief with respect to the constitutionality of actions

1

Dockets.Justia.com

undertaken by the Legislative and Executive representatives of the Borough of Morrisville, Political Subdivision of the Commonwealth of Pennsylvania, and by the Borough of Morrisville Zoning Hearing Board, restricting adult entertainment establishments through a framework of zoning and regulatory ordinances, which, jointly and severally, impose restrictions and prohibitions on First Amendment protected expression, specifically on adult entertainment businesses and on commercial signs.

2.     Plaintiffs submit that the subject restrictions act as a prior restraint, lack a methodologically proper legislative basis or predicate, allow for the exercise of unbridled administrative discretion, lack adequate procedural safeguards, result in a "zone-out" that fails to provide for "adequate alternative avenues of communication" for adult entertainment businesses, and are fundamentally unconstitutional, both facially and as applied to Plaintiffs herein.

3.     It is further alleged that the legislation challenged herein, and the actions of the Borough of Morrisville Zoning Hearing Board violate the constitutional rights of the Plaintiffs, and actions of the Zoning Hearing Board specifically interfere with and destroy the contract between the Plaintiffs for the development of the stated use, thus independently violating the United States Constitution. Plaintiffs seek damages and injunctive relief for the irreparable harm directly caused by Morrisville's unlawful actions and the unlawful actions of the Morrisville Zoning Hearing Board.  This action is filed within thirty (30) days of rendition of the Order of the Morrisville Zoning Hearing Board.

## II. JURISDICTION AND VENUE

4.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C., Sec. 2201 and to Rule 65, Federal Rules of Civil Procedure, and pursuant to 42 U.S.C., Sec. 1983; 42 U.S.C., Sec.1988,

and to the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and to Article I, Section 10 of the Constitution of the United States.

5.     The Diversity Jurisdiction of this Court is invoked pursuant to 28 U.S.C., Sec. 1332 because Plaintiff, Stockham Interests, LLC, is a citizen of the State of New Jersey and all Defendants are citizens of the Commonwealth of Pennsylvania. Stockham Interests, LLC, seeks damages in excess of $75,000 exclusive of interest, costs and attorney's fees, thereby bringing this matter within the Diversity Jurisdiction of this Court over both the Federal and State law claims.

6.     Supplemental State Law claims are brought pursuant to this Court's Supplemental Jurisdiction as provided for in 28 U.S.C., Sec. 1367.

7.     Plaintiffs' state law claims, brought under this Court's Supplemental Jurisdiction, are brought pursuant to Article I, §. 7 of the Constitution of the Commonwealth of Pennsylvania, as adjudicated in *City of Erie v. Pap's A.M.*, 812 A.2d 591, (Penn. 2002).

8.     The Supplemental Jurisdiction of this Court with respects to the Petition for On-The-Record Review is invoked pursuant to 28 U.S.C. § 1367 and to *City of Chicago et al., v. International College of Surgeons,* 522 U.S. 156, 118, S.Ct. 523, (1997). The claims in the Petition for On-The-Record Review are so directly related to, and inextricably intertwined with, the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article II of the Constitution of the United States.

9.     Venue is proper in the Eastern District of Pennsylvania, since the conduct complained of herein occurred within Bucks County, Pennsylvania, which is within geographical area assigned to the Eastern District of Pennsylvania, Philadelphia Division.

10. This action is brought to determine issues, rights and liabilities of an actual and present controversy between the parties involving the constitutional validity of Morrisville legislation, attempting to impose a panoply of restrictions and requirements on adult entertainment businesses, and essentially making it impossible to operate any form of facility offering protected forms of expression.

11. This action is also brought to determine issues, rights and liabilities of an actual and present controversy between the parties involving the constitutional validity of Morrisville legislation, attempting to regulate signage within the Borough.

12. There are substantial *bona fide* doubts, disputes and questions that must be resolved concerning whether the various subject provisions of the Morrisville legislation at issue violate the rights of Plaintiffs under the First, Fourth, and Fifth Amendments to the Constitution of the United States as applied to the states through the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Constitution and pursuant to Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania.

13. Plaintiffs seek to obtain temporary and permanent injunctions to enjoin Defendant Morrisville from enforcing any and all provisions of the challenged legislation because such enforcement eliminates, prevents, chills and/or discourages, and, ultimately, totally restrains Plaintiffs from owning, operating and participating in the presentation of Constitutionally protected dance performances, arbitrarily banned throughout the Defendant Jurisdiction.

14. Plaintiffs seek to obtain temporary and permanent injunctions to enjoin Defendant Morrisville from enforcing any and all provisions of the challenged sign legislation because such enforcement eliminates, prevents, chills and/or discourages, and, ultimately, restrains Plaintiff

4

Stockham from offering protected commercial speech in the form of a "wallscape" to be placed on Plaintiff's building.

15.     Plaintiffs further seek a declaratory judgment specifically finding the subject provisions of the challenged legislation to be unconstitutional because said provisions deny Plaintiffs their Federal Constitutional rights of free speech and expression, due process, equal protection, adequate procedural safeguards, and prompt judicial review.

16.     Plaintiffs also seek a declaratory judgment that the actions of the Morrisville Zoning Hearing Board in adjudicating Plaintiffs' applications for variances denied Plaintiffs procedural and substantive due process and deprived Plaintiffs of property rights guaranteed by the Constitution and laws of the Commonwealth of Pennsylvania.

## III. PARTIES

17.     Plaintiff, Stockham Interests, LLC., (hereinafter "Stockham"), is a New Jersey Limited Liability Company, which does business in, and owns real property in, the Borough of Morrisville.

18.     Plaintiff, 10 Enterprises, hereinafter "10"), is a New Jersey Limited Liability Company which has a lease for the first and second floors of the real property owned by Stockham Interests, LLC, for the purposes of operating an adult entertainment establishment presenting dance performances protected by the First Amendment to the Constitution of the United States and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania. The content of 10's proposed dance performances emphasizes issues dealing with human sexuality. 10 wishes to offer its dance performances at its leased facility located at 10 South Pennsylvania Avenue, Morrisville, Pennsylvania. A copy of the lease is found as Exhibit A, attached hereto and made a part hereof by reference.

19.     Defendant, the Borough of Morrisville, (hereinafter "Morrisville" or Defendant) was and is a political subdivision of the Commonwealth of Pennsylvania, duly governed and limited by the Constitution of the Commonwealth of Pennsylvania, and whose authority to enact and enforce zoning and licensing laws is governed by said Constitution, as well as by the Constitution of the United States.

20.     Defendant, Borough of Morrisville Zoning Hearing Board is a quasi-judicial board appointed by the Borough Council to adjudicate matters related to the Borough's Zoning Ordinance.

## IV. GENERAL ALLEGATIONS

## A. PLAINTIFFS' STATEMENT OF POSITION

21.     Plaintiffs seek to lease, sell, or otherwise operate a place of public assembly that engages in the presentation of exotic dance performances protected by the First Amendment to the Constitution of the United States and by Article I, §. 7 of the Constitution of the Commonwealth of Pennsylvania, which contain as an integral component of their communicative characteristics an emphasis on human sexuality. The performances which are intended to take place within Plaintiffs' business are non-obscene.

22.     The proposed location of the Plaintiffs' business is in an area of generic commercial uses which are fronted by widely traveled roadways.

23.     Plaintiffs' business location has been the subject of significant investment and development sums to rehabilitate and improve the building which is a focal point of downtown Morrisville in a key location in the Borough.

24.     The general area of Plaintiff's building has suffered urban decline and blight typical of older downtown areas in the first tier of suburbs built adjacent to major urban metropolis areas

such as the City of Philadelphia. As demonstrated in Count XLI, *infra*, the On the Record Review of the action of the Morrisville Zoning Hearing Board, Stockham Interests, LLC, has spent considerable sums on improvements to the building and was prepared to make massive expenditures and provide a number of civic improvements to the immediate area of its building as voluntary conditions of the requested use variance.

25.    10 Enterprises, LLC, also spent considerable sums of money designing the second floor of the subject building for use as an adult cabaret for the specific purpose of being a facility that offers "adult entertainment" by providing detailed interior and exterior design plans for the facility. (See Count XLI, Statement of Facts.)

26.    The operation of the proposed Plaintiffs' business will not cause any disproportionate secondary effects within Morrisville. The operation of the business will not cause a decrease in property values, an increase in criminal activity, or the acceleration of urban blight. In fact, the only evidence offered in the public hearing conducted by the Zoning Hearing Board was that the area already suffered signs of urban decline and blight, and that the improvements proposed by Plaintiffs would ameliorate those blighting influences.

27.    Plaintiffs' proposed business would be brought into compliance with all relevant governmental building codes, and is designed to be safe for public occupancy as a place of public assembly.

28.    Plaintiffs' business success is predicated on anticipated public appeal in the expressive dance performances performed by professional artists, a format successfully and lawfully presented and utilized in numerous cities and counties throughout the United States.

29.    The Plaintiffs believe that the presentation of expressive dance performances is a beneficial social activity which creates an improved self image for the dancer and joy and

entertainment for the beholder. The Plaintiffs consider the appreciation of the human body (an integral component of the exotic dance performances described herein, which exhibit the socially accepted and/or popular contemporary concepts of physical ability and attractiveness), a socially fulfilling experience for both performers and patrons.

30.     The Plaintiffs wish to communicate the above beliefs through the medium of dance, through the presentation of professional exotic dance performances at the proposed facility in Morrisville. The Plaintiffs do not intend the performances to be, nor will the performances be obscene.

31.     As a direct and proximate result of Morrisville's unconstitioinal legislation, the Plaintiffs are thwarted and restrained from enjoying the benefits of their contractual relationship, and restrained from presenting any form of expressive dance performances, particularly in the restaurant context desired, but arbitrarily prevented by Morrisville's unconstitutional actions.

32.     Plaintiff Stockham offered the Morrisville Zoning Hearing Board an alternative proposal, a request for a sign variance permitting a "wallscape" sign on the South face of the building where considerable signage would already be permitted in conformance with the Borough's Zoning Ordinance.

33.     The wallscape form of signage is in widespread, successful and lawful use throughout the United States.

34.     As a direct and proximate result of Morrisville's unconstitioinal legislation, Plaintiff Stockham is thwarted and restrained from enjoying the benefits of its contractual relationship with the sign company that wished to place the wallscape sign on the building, and is restrained from presenting the commercial speech which it desires to present.

## B. DESCRIPTION OF THE FACTUAL HISTORY LEADING

## TO THE INSTANT DISPUTE

35.    Stockham Interests, LLC, is a real estate developer which owns the real property at issue herein, 10 South Pennsylvania Avenue, Morrisville, Pennsylvania.

36.    Stockham Interests, LLC, identified 10 South Pennsylvania Avenue as an historic building in a declining downtown area of Morrisville and recognized the potential for rehabilitating the building with a fitness center on the third and fourth floors; 10 Enterprises' adult cabaret on the second floor and a combination of restaurant, retail and service commercial land uses on the ground floor.

37.    In anticipation of presenting their proposal for an upscale adult cabaret, Plaintiffs, Stockham and 10 spent considerable sums in interior design services to obtain detailed plans and renderings of the adult cabaret and of the ground floor uses.

38.    Stockham also recognized a potential alternate way of rehabilitating the building by placing a wallscape sign on its South frontage, thereby generating sufficient revenue to permit the continued rehabilitation of the subject building.

## C. DESCRIPTION OF THE PERTINENT PROVISIONS OF THE BOROUGH'S

## CHALLENGED LEGISLATION

### C.1. ADULT USE REGULATIONS

39.    The Borough of Morrisville regulates sexually-oriented Adult Uses through its Zoning Ordinance and through a separate chapter of the Borough Code, Chapter 106. The relevant zoning regulations were adopted by Ordinance 899 on February 16, 1999 and amended by Ordinance 958 on May 21, 2007. A copy of the regulations is found as Exhibit B, attached hereto and made a part hereof by reference. Chapter 106 was adopted by Ordinance 752 on April 8,

1980 and amended in its entirety by Ordinance 921 on July 15, 2002.[1] A copy of Chapter 106 is found as Exhibit C, attached hereto and made a part hereof by reference.

40.     The requirements of the adult use zoning regulations and of Chapter 106 are essentially identical except that the zoning regulations also impose a segregation requirement from residential land uses, in addition to the segregation requirements from residential zoning districts.

## C.2. SIGN REGULATIONS

41.     The Borough of Morrisville regulates signs solely through its Zoning Ordinance. These regulations were apparently adopted in the Borough's original Zoning Ordinance and the relevant provisions have not been amended since. These provisions are found as Article VII, § 465-44, *et.seq.*, of the Borough of Morrisville Code. A copy of the regulations is found as Exhibit D, attached hereto and made a part hereof by reference.

## D. PLAINTIFFS' STATEMENT OF JURISDICTIONAL ALLEGATIONS ESTABLISHING STANDING, RIPENESS AND A RIGHT TO RELIEF

### D.1. ADULT USE REGULATIONS

42.     The challenged legislation, particularly the adult entertainment zoning restrictions of the challenged legislation set forth above purport to restrict and restrain the legal operation of Plaintiffs' format of adult entertainment in conjunction with the sale of food by imposing restrictions which directly impair and chill the activities manifested by Plaintiffs' business and which activities are protected by the First Amendment to the Constitution of the United States and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania.

---

[1] Plaintiffs, through a Pennsylvania agent, are seeking to 1 determine if the Borough complied with Pennsylvania law in the adoption of these four ordinances. If necessary, this determination will be made through discovery in this matter. If the Borough did not comply with Pennsylvania law in the adoption of these ordinances, Plaintiffs will seek to amend this Complaint with the appropriate allegations.

43.     Plaintiffs have a clear legal right to the use and operation of their proposed business and the presentation of the above described performances without interference by the Borough, its agents, servants or employees. Such lawful use may be restrained and/or terminated only after Plaintiffs have been afforded due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution. Plaintiffs have been denied due process of law by the numerous prior restraints of the challenged legislation on a form of expression protected by the First Amendment and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania.

44.     Plaintiffs assert that their position, as set forth in this Complaint, is legally sound and supported by fact and law. The Defendant's actions, however, have created a *bona fide* controversy between the parties, and Plaintiffs are in doubt as to their rights, privileges and immunities with respect to the challenged legislation. Plaintiffs require, therefore, a declaratory judgment declaring their rights, privileges and immunities. There is a clear, present, actual, substantial and *bona fide* justiciable controversy between the parties.

45.     Plaintiffs are and will be threatened with prosecution for initiating the presentation of expressive dance performances at the proposed location for which Plaintiffs stand to suffer severe criminal penalties, if such performances take place subsequent to the arbitrarily imposed restrictions of the Borough's legislation. Alternatively, Plaintiffs will be required to abandon or to substantially alter the form and content of the First Amendment protected exotic dance performances at the proposed location thus limiting the Plaintiffs' freedom of expression, destroying the business goodwill sought to be developed by the Plaintiffs, and causing the Plaintiffs severe financial hardship and damages, in addition to the irreparable harm caused by the deprivation of the rights at issue, which rights are protected by the First Amendment to the

11

Constitution of the United States and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania.

46.    Plaintiffs have no adequate remedy at law. No amount of money damages could adequately compensate the Plaintiffs for the irreparable harm described herein.

47.    Plaintiffs and their agents, employees, entertainers, patrons, and the public at large will suffer irreparable injury if injunctive relief is not granted, and Defendant is permitted to enforce the challenged provisions of the challenged legislation against the Plaintiffs. The loss of rights guaranteed by the First Amendment is so serious that, as a matter of law, irreparable injury is presumed and in such an instance involving the loss of First Amendment rights, damages are both inadequate and unascertainable.

48.    The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of an invalid ordinance which interferes with the Plaintiffs' and the public's rights under the First Amendment to the United States Constitution and under Article I, § 7 of the Pennsylvania Constitution.

49.    All conditions precedent to the institution and maintenance of this cause of action have occurred or have been performed, and Plaintiffs sought and were denied the administrative remedies or waivers that were available to them. In pursuing these administrative remedies, Plaintiffs/Petitioners specifically reserved their rights to bring the challenges made in this Complaint. See, transcript attached to Count XLI, at page 16, ll. 14 - 19.

50.    In the course of pursuing their administrative remedies, Plaintiffs were denied the substantive and procedural due process guaranteed by the First, Fifth and Fourteenth Amendments to the Constitution of the United States and by the corresponding provisions of the Constitution of the Commonwealth of Pennsylvania.

51.     In particular, the Zoning Hearing Board failed to provide procedural due process in the course of its hearing and failed to base its decisions on competent, substantial evidence.

52.     Further, the Zoning Hearing Board in "caucusing" in view of the public but out of hearing of the public, violated numerous provisions of the Pennsylvania Sunshine Law, 65 Pa. C.S.A., § 701, *et.seq.*, thereby violating Plaintiffs' civil rights.

53.     The acts, practices and jurisdiction of Defendant as set forth herein, were and are being performed under color of state law and therefore constitute state action within the meaning of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

## D.2. SIGN REGULATIONS

54.     The challenged legislation, particularly the signage zoning restrictions of the challenged legislation set forth above purport to restrict and restrain the legal operation of Plaintiff Stockham's proposed signage which signage is protected by the First Amendment to the Constitution of the United States and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania.

55.     Plaintiff has a clear legal right to the use and the placement of the above described signage without interference by the Borough, its agents, servants or employees. Such lawful use may be restrained and/or terminated only after Plaintiff has been afforded due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution and Plaintiff has been denied due process of law by the numerous prior restraints on a form of expression imposed by the challenged legislation on speech protected by the First Amendment and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania.

56.     Plaintiff Stockham asserts that its position, as set forth in this Complaint, is legally sound and supported by fact and law. The Defendant's actions, however, have created a *bona fide* controversy between the parties, and Plaintiff is in doubt as to its rights, privileges and immunities with respect to the challenged legislation. Plaintiff requires, therefore, a declaratory judgment declaring its rights, privileges and immunities. There is a clear, present, actual, substantial and *bona fide* justiciable controversy between the parties.

57.     Plaintiff is and will be threatened with prosecution for placing its proposed signage at the proposed location for which Plaintiff stands to suffer severe criminal penalties, if such signage is subject to the Borough's legislation.

58.     Plaintiff has no adequate remedy at law. No amount of money damages could adequately compensate the Plaintiff for the irreparable harm described herein.

59.     Plaintiff Stockham and its agents and sign contractor, and the public at large, will suffer irreparable injury if injunctive relief is not granted, and Defendant is permitted to enforce the challenged provisions of the challenged legislation against the Plaintiff. The loss of rights guaranteed by the First Amendment is so serious that, as a matter of law, irreparable injury is presumed and in such an instance involving the loss of First Amendment rights, damages are both inadequate and unascertainable.

60.     The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of an invalid ordinance which interferes with the Plaintiff's and the public's rights under the First Amendment to the United States Constitution and under Article I, § 7 of the Pennsylvania Constitution.

61. All conditions precedent to the institution and maintenance of this cause of action have occurred or have been performed, and Plaintiff sought and was denied the administrative remedies or waivers that were available to it.

62. In the course of pursuing its administrative remedies, Plaintiff Stockham was denied the substantive and procedural due process guaranteed by the First, Fifth and Fourteenth Amendments to the Constitution of the United States and by the corresponding provisions of the Constitution of the Commonwealth of Pennsylvania.

63. In particular, the Zoning Hearing Board failed to provide procedural due process in the course of its hearing and failed to base its decisions on competent, substantial evidence.

64. Further, the Zoning Hearing Board in "caucusing" in view of the public but out of hearing of the public, violated numerous provisions of the Pennsylvania Sunshine Law, 65 Pa. C.S.A., § 701, *et.seq.*, thereby violating Plaintiff's civil rights.

65. The acts, practices and jurisdiction of Defendant as set forth herein, were and are being performed under color of state law and therefore constitute state action within the meaning of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

## COUNT I

66. Defendant's challenged Adult Use legislation, (which will be referred to hereafter as the "Adult Use legislation") violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it abridges and restrains the Plaintiffs' rights to free expression, in violation of the First Amendment.

## COUNT II

67.     Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it constitutes a prior restraint on such expression, in violation of the First Amendment.

## COUNT III

68.     Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied, in that it constitutes an impermissible "chilling effect" on constitutionally protected speech and expression, in violation of the First Amendment.

## COUNT IV

69.     Defendants Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it denies equal protection of the law in that the legislation is arbitrary, oppressive and capricious and unreasonably requires the Plaintiffs to submit to controls not imposed on other similarly situated businesses or properties, both locally as to other places of public assembly, and throughout the Commonwealth, as to restaurants lawfully and successfully presenting protected adult oriented performances.

## COUNT V

70.     Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it acts in a way that is arbitrary and capricious as applied to the Plaintiffs' proposed business.

## COUNT VI

71.     Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, as an unlawful exercise of the state's

police power in that there is no substantial relationship to the protection of the public health and welfare or any legitimate governmental objective, resulting in the fact that there has been no proper predicate for the basis of the challenged legislation.

### COUNT VII

72.    Defendants Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it uses terms vague and indefinite and fails to properly define all phrases set forth therein, and also fails to set out distinct criteria, thus leaving persons of common intelligence to guess as to their meaning and differ as to its application.

### COUNT VIII

73.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it lacks adequate procedural safeguards.

### COUNT IX

74.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied, in that it manifests an improper purpose in that the challenged legislation is not content-neutral and is not unrelated to the suppression of free speech.

### COUNT X

75.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied, in that it contains restrictions on First Amendment freedoms that are overbroad and far greater than are essential to the furtherance of any alleged government interest.

## COUNT XI

76.     Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiff, in that it fails to provide sufficient alternative avenues of communication by impermissibly limiting available locations for adult businesses.

## COUNT XII

77.     Defendants challenged legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied, in that it grants unbridled discretion to the administrative officials in the enforcement of its provisions.

## COUNT XIII

78.     Defendant's challenged legislation violates the rights guaranteed Plaintiff's by the United States Constitution, on its face and as applied, in that the adult use regulatory scheme is an unlawful exercise of the State's Police Power.

## COUNT XIV

79.     Plaintiffs had a contractual relationship for the lease of a portion of the subject property for the specific use of the subject property as an exotic dance club and place of public assembly serving food to patrons, in conjunction with providing First Amendment protected dance performances, the content of which emphasizes issues dealing with human sexuality, at its subject facility. The actions of Morrisville, as described herein, impair the agreement which was entered into by Plaintiffs, first, by completely frustrating the use of the subject property for the contractually agreed upon use, and second, by implementing restrictions which impose a chilling effect and prior restraint on the exercise of expressive activities as contemplated by the original contract, as well as imposing a direct, content based restriction on the specific dance

performances sought to be presented by Plaintiffs, in violation, not only of the First Amendment, but also in violation of Article I, Section 10 of the United States Constitution.

## COUNT XV

80.    Defendant's challenged Signage legislation, (which will be referred to hereafter as the "Signage legislation") violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiff Stockham, in that it abridges and restrains the Plaintiff's rights to free expression, in violation of the First Amendment.

## COUNT XVI

81.    Defendant's Signage legislation violates the rights guaranteed Plaintiff Stockham by the United States Constitution, on its face and as applied to Plaintiff, in that it constitutes a prior restraint on such expression, in violation of the First Amendment.

## COUNT XVII

82.    Defendant's Signage legislation violates the rights guaranteed Plaintiff Stockham by the United States Constitution, on its face and as applied, in that it constitutes an impermissible "chilling effect" on constitutionally protected speech and expression, in violation of the First Amendment.

## COUNT XVIII

83.    Defendant's Signage legislation violates the rights guaranteed Plaintiff Stockham by the United States Constitution, on its face and as applied to Plaintiff, in that it acts in a way that is arbitrary and capricious as applied to the Plaintiffs' proposed wallscape sign

## COUNT XIX

84.    Defendant's Signage legislation violates the rights guaranteed Plaintiff Stockham by the United States Constitution, on its face and as applied to Plaintiff, as an unlawful exercise of the

state's police power in that there is no substantial relationship to the protection of the public health and welfare or any legitimate governmental objective, resulting in the fact that there has been no proper predicate for the basis of the challenged legislation.

### COUNT XX

85.    Defendant's Signage legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied to Plaintiffs, in that it lacks adequate procedural safeguards.

### COUNT XXI

86.    Defendant's Signage legislation violates the rights guaranteed Plaintiff Stockham by the United States Constitution, on its face and as applied, in that it manifests an improper purpose in that the challenged legislation is not content-neutral and is not unrelated to the suppression of free speech.

### COUNT XXII

87.    Defendant's Signage legislation violates the rights guaranteed Plaintiff Stockham by the United States Constitution, on its face and as applied, in that it contains restrictions on First Amendment freedoms that are overbroad and far greater than are essential to the furtherance of any alleged government interest.

### COUNT XXIII

88.    Defendants challenged legislation violates the rights guaranteed Plaintiffs by the United States Constitution, on its face and as applied, in that it grants unbridled discretion to the administrative officials in the enforcement of its provisions.

**COUNT XXIV**

89.    Defendant's challenged legislation violates the rights guaranteed Plaintiff's by the United States Constitution, on its face and as applied, in that the signage regulatory scheme is an unlawful exercise of the State's Police Power.

**COUNT XXV**

90.    Plaintiff Stockham had a contractual relationship for the installation of the wallscape sign. The actions of Morrisville, as described herein, impair the agreement which was entered into by Plaintiff Stockham.

**COUNT XXVI**

(Supplemental Jurisdiction)

91.    Defendant's challenged Adult Use legislation, (which will be referred to hereafter as the "Adult Use legislation") violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, in that it abridges and restrains the Plaintiffs' rights to free expression, in violation of Article I, § 7 of the Pennsylvania Constitution.

**COUNT XXVII**

(Supplemental Jurisdiction)

92.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, in that it constitutes a prior restraint on such expression, in violation of the Article 1, § 7 Of the Pennsylvania Constitution.

**COUNT XXVIII**

(Supplemental Jurisdiction)

93.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the

Constitution of the Commonwealth of Pennsylvania, on its face and as applied, in that it

constitutes an impermissible "chilling effect" on constitutionally protected speech and

expression, in violation of the Article I, § 7 of the Pennsylvania Constitution.

## COUNT XXIX

(Supplemental Jurisdiction)

94.    Defendants Adult Use legislation violates the rights guaranteed Plaintiffs by the

Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, in

that it denies equal protection of the law in that the legislation is arbitrary, oppressive and

capricious and unreasonably requires the Plaintiffs to submit to controls not imposed on other

similarly situated businesses or properties, both locally as to other places of public assembly, and

throughout the Commonwealth, as to restaurants lawfully and successfully presenting protected

adult oriented performances.

## COUNT XXX

(Supplemental Jurisdiction)

95.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the

Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, in

that it acts in a way that is arbitrary and capricious as applied to the Plaintiffs' proposed business.

## COUNT XXXI

(Supplemental Jurisdiction)

96.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the

Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, as an

unlawful exercise of the state's police power in that there is no substantial relationship to the

protection of the public health and welfare or any legitimate governmental objective, resulting in the fact that there has been no proper predicate for the basis of the challenged legislation.

## COUNT XXXII

### (Supplemental Jurisdiction)

97.    Defendants Adult Use legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, in that it uses terms vague and indefinite and fails to properly define all phrases set forth therein, and also fails to set out distinct criteria, thus leaving persons of common intelligence to guess as to their meaning and differ as to its application.

## COUNT XXXIII

### (Supplemental Jurisdiction)

98.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiffs, in that it lacks adequate procedural safeguards.

## COUNT XXXIV

### (Supplemental Jurisdiction)

99.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied, in that it manifests an improper purpose in that the challenged legislation is not content-neutral and is not unrelated to the suppression of free speech.

## COUNT XXXV

### (Supplemental Jurisdiction)

100.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied, in that it contains restrictions on free speech that are overbroad and far greater than are essential to the furtherance of any alleged government interest.

## COUNT XXXVI

### (Supplemental Jurisdiction)

101.    Defendant's Adult Use legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied to Plaintiff, in that it fails to provide sufficient alternative avenues of communication by impermissibly limiting available locations for adult businesses.

## COUNT XXXVII

### (Supplemental Jurisdiction)

102.    Defendants challenged legislation violates the rights guaranteed Plaintiffs by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied, in that it grants unbridled discretion to the administrative officials in the enforcement of its provisions.

## COUNT XXXVIII

### (Supplemental Jurisdiction)

103.    Defendant's challenged legislation violates the rights guaranteed Plaintiff's by the Constitution of the Commonwealth of Pennsylvania, on its face and as applied, in that the adult use regulatory scheme is an unlawful exercise of the State's Police Power.

## COUNT XXXIX

### (Supplemental Jurisdiction)

104. Plaintiffs had a contractual relationship for the lease of a portion of the subject property for the specific use of the subject property as an exotic dance club and place of public assembly serving food to patrons, in conjunction with providing protected speech in the form of dance performances, the content of which emphasizes issues dealing with human sexuality, at its subject facility. The actions of Morrisville, as described herein, impair the agreement which was entered into by Plaintiffs, first, by completely frustrating the use of the subject property for the contractually agreed upon use, and second, by implementing restrictions which impose a chilling effect and prior restraint on the exercise of expressive activities as contemplated by the original contract, as well as imposing a direct, content based restriction on the specific dance performances sought to be presented by Plaintiffs, in violation of Article I, § 7 0f the Pennsylvania Constitution.

## COUNT XL

105. Although damages are an inadequate remedy for the deprivation of rights guaranteed by the First Amendment to the Constitution of the United States and by Article I, § 7 of the Constitution of the Commonwealth of Pennsylvania, Plaintiffs Stockham and 10 have suffered monetary damages as a result of the actions of Defendants Morrisville and the Morrisville Zoning Hearing Board and Plaintiffs seek compensatory damages from these Defendants.

## ENTITLEMENT TO ATTORNEY'S FEE PURSUANT TO 42 D.S.C. SECTION 1988

106. In their legitimate desire to pursue the rights and privileges guaranteed by the Constitution and laws of the United States, the Plaintiff has employed the undersigned to defend

this action and has agreed to pay a reasonable fee for same, which fees and costs should be awarded to Plaintiff pursuant to 42 U.S.C. § 1988.

## DEMAND FOR JURY TRIAL

107. The Plaintiffs herein demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court GRANT the following relief:

a. Declaring the Defendant's challenged legislation, both the Adult Use zoning regulations and the signage regulations, to be violative of the aforementioned federal and state constitutional and statutory provisions;

b. Appropriately set and hold a hearing, and preliminarily enjoin Defendants from applying and enforcing the challenged legislation, in whole or in part, against Plaintiffs, with the subsequent entry of a permanent injunction after proper administration of the complaint herein;

c. Awarding all actual, consequential, direct, and special damages deemed to be attributable to Morrisville and the Morrisville Zoning Hearing Board;

d. Awarding any and all attorney's fees and costs as authorized by law;

e. Awarding such other and further relief as this Court deems fit, just, proper and equitable.

## COUNT XLI

## PETITION FOR ON THE RECORD REVIEW

## A. JURISDICTION

Pursuant to 28 U.S.C. § 1367 and *International College of Surgeons, supra*, Petitioners appeal to this Court the denial of their original and alternate use variance requests made to and

heard by the Morrisville Zoning Hearing Board. In *College of Surgeons*, the Court held, in pertinent part:

> We granted certiorari to address whether a case containing claims that local administrative action violates federal law, but also containing state law claims for on-the-record review of the administrative findings, is within the jurisdiction of federal district courts. 520 U. S. ___ (1997). Because neither the jurisdictional statutes nor our prior decisions suggest that federal jurisdiction is lacking in these circumstances, we now reverse.
>
> ... In this case, there can be no question that ICS's state court complaints raised a number of issues of federal law in the form of various federal constitutional challenges to the Landmarks and Designation Ordinances, and to the manner in which the Commission conducted the administrative proceedings. It is true, as ICS asserts, that the federal constitutional claims were raised by way of a cause of action created by state law, namely, the Illinois Administrative Review Law. ... As we have explained, however, "[e]ven though state law creates [a party's] causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law." ...
>
> As for ICS's accompanying state law claims, this Court has long adhered to principles of pendent and ancillary jurisdiction by which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that "derive from a common nucleus of operative fact," such that "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional" case. ...
>
> ...
>
> The District Court properly recognized that it could exercise supplemental jurisdiction over ICS's state law claims, including the claims for on-the-record administrative review of the Landmarks Commission's decisions." [Citations omitted] *Ibid.*

In the instant case, this Petition for Writ of Certiorari and the related Counts specified herein are inextricably intertwined; they derive from the same common nucleus of operative facts. The record for the Petition for the on-the-record review supports and enhances

Plaintiffs/Petitioners' claim that the Borough's adult use zoning regulations are facially unconstitutional in violation of the Federal Constitution, and that these restrictions provide no procedural safeguards and contain absolutely no criteria consistent with the First Amendment protections at issue herein. The Petition also establishes that the Morrisville Zoning Hearing Board failed to provide Petitioners with either substantive or procedural due process.

Thus, this Petition serves as a *de facto* and *de jure* "as applied" challenge on these issues.

Accordingly, this Court should exercise its discretion and accept supplemental jurisdiction over this Petition for an on-the-record review of the actions of the Morrisville Zoning Hearing Board.

## B. RECORD REFERENCES

References to the transcript of the proceedings of the Zoning Hearing Board will be to (T at ___); references to record documents in the proceedings before the Zoning Hearing Board will be to ( R at ___); references to Exhibits already made part of this Complaint will be to the Exhibit Number given above.

## C. STATEMENT OF THE CASE AND OF THE FACTS

Petitioner Stockham Interests, LLC owns certain real property in the Borough of Morrisville located at 10 South Pennsylvania Avenue, on County Tax Parcel 24-09-277, as shown in the Borough Atlas, page number 12, Atlas Numbers 264-265. (T at 11, ll. 6 - 9.) Petitioner 10 Enterprises, LLC, is the contract lessee of a portion of the premises owned by Stockham. (T at 15, ll. 13 - 15.)

Petitioners applied to the Borough for a use variance ( R at A1), (as permitted by Pennsylvania law), to permit the second floor of their building to be used as an adult entertainment establishment, to wit, an establishment offering live performances as described in

¶¶ 18, 21, 29-30, *supra*. Such use is not permitted in the C-1 Central Commercial Zoning District in which the subject property is located. The subject property also does not meet the segregation requirements of the Borough's Adult Use Zoning Regulations (Exhibit B) (T at 11, ll. 1 - 6.)

In the alternative, Petitioner Stockham Interests, LLC, requested a variance to permit a "wallscape" sign on the South face of the subject building which sign would violate other provisions of the Borough of Morrisville Zoning Code (T at 67, l. 20 - 68, l. 8.)

After an "off the record" discussion, in violation of the Pennsylvania Sunshine Law, 65 Pa C.S.A. § 701, *et.seq.*, (T at 147, l. 13), the Zoning Hearing Board voted, without explanation to deny both variance requests.[1] The Board Secretary than announced that the Board had 45 days to render a written decision in this matter, which written decision would trigger the appeal period. To date, Petitioners have not been provided with said written decision and, in an abundance of caution, this appeal is taken within 30 days of the decision of the Board.

After formalities about notice, etc., Petitioners' witnesses were identified and then sworn in. (T at 12, l. 9 - 13, l. 16.) The Board Attorney also announced that two exhibits had been marked at the first hearing on this matter including the petition and related documents ( R-1); and a letter requesting a continuance, ( R-2), (T at 13, l. 23 - 14, l. 11.) Mr. Todd J. Colarusso, Managing Member of Stockham Interests, LLC, also specifically made a reservation of rights with respect to substantive and procedural challenges to the Borough's adult use zoning regulations. (T at 16, ll. 14 - 19.)

With respect to the substance of the proceedings, Petitioners then began their presentation with Mr. Colarusso, introducing the project. Mr. Colarusso identified Stockham's interest and history in the area, including the subject building and an adjacent building, and Stockham's

---

[1] A procedural motion allowing the amendment to the variance request to include the alternate request was granted.

rehabilitation efforts. (T at 14, l. 20 - 15, l. 3.) Mr. Colarusso also described the difficulties in finding tenants for the building. (T at 15, ll. 4 - 12.)

Mr. Colarusso then described the lease offer from 10 Enterprises, to establish an adult cabaret in the building and that a variance is required to permit such use. Mr. Colarusso also identified other variances required as part of the application, including a sign variance to permit a larger sign since the 19,000 square foot building would be primarily occupied by only two tenants. (T at 15, l. 13 - 16, l. 13.)

Mr. Colarusso further identified Petitioners' interaction with the Borough's Economic Development Commission, which resulted in the apparent approval of the Commission of the physical revitalization proposed but disapproved of the proposed adult entertainment use on the second floor of the building. (T at 16, l. 20 - 17, l. 4.) Mr. Colarusso concluded his introductory remarks noting Petitioners' entitlement to due process and a decision by the Board based on the law. (T at 17, ll. 4 - 8.) As a final introductory matter, Mr. Colarusso identified the witnesses who would be testifying. (T at 17, ll. 12 - 23.)

The first witness was Mr. Ron Cocron, a Realtor who is charged with attempting to lease Stockham's building in its present condition. Mr. Cocron presented his credentials, (T at 20, ll. 1 - 17), and then described his efforts to lease the building, (T at 20, l. 18 - 21, l. 8.) Mr. Cocron also acknowledged that Stockham Interests, LLC, has made its own efforts to lease the building, and has been flexible with its lease requirements. (T at 21, ll. 9 - 18.)

Mr. Cocron further testified that of roughly 100 showings he made and a further 15 to 20 showings by a nearby Realtor, they had secured two small leases. (T at 21, l. 18 - 22, l. 5.) Finally, Mr. Cocron testified that the original listing price was $100 per square foot, and that

price has now been lowered to about $75.00 per square foot, (T at 22, ll. 6 - 13), still failing to attract potential buyers. (T at 22, ll. 14 - 16.)

There was then a colloquy between a member of the Board (Mr. Frigerio) and Mr. Cocron as to whether the building's elevator was working and whether the fact that it was out of service might be a deterrent to renting space in the building. Mr. Cocron replied that the problems with the elevator might have affected prospective tenants for the fourth floor but was not a deterrent to potential tenants on the ground floor. (T at 23, ll. 2 - 15.) The colloquy continued with respect to the state of repair of the ground floor windows, to which Mr. Cocron replied that damage to the ground floor windows was recent and had not occurred at earlier times. (T at 23, l. 22 - 24, l. 24.) The colloquy then continued further with respect to the sales and rental prices for the building. (T at 25, ll. 1 - 13).

Another Board Member, Mr. Kenner, then inquired about the condition of the building, which Mr. Cocron described as "fair," with the building needing some work. (T at 25, l. 1 - 26, l. 19.) Mr. Cocron further attributed some of the problems with marketing the building to the poor conditions of the adjacent municipal infrastructure: the parking lot, grass plot and bus stop. (T at 26, l. 20 - 27, l. 5.)

The next witness for Petitioners was Holly Mikhailik from Casa Bella Design. Ms. Mikhailik made a detailed presentation of the design details of the proposed first floor restaurant and second floor adult cabaret. (T at 31, l. 9 - 38, l. 7.).[1] The essence of Ms. Mikhailik's presentation was that the first floor restaurant and the second floor adult cabaret would have a

---

[1] At Page 35, l. 20, Ms. Mikhailik mis-spoke when she described making 2 the adult cabaret "comfortable for couples and families ..." Mr. McLaughlin clarified that while couples were expected to attend the adult cabaret, it would not be open to families. (T at 59, ll. 5 - 12.) Mr. Colarusso made a similar clarification. (T at 79, ll. 3 - 11.)

French theme and would be very upscale; and that elements of this scheme would be carried on into the third and fourth floor gymnasium operation.

Mr. Colarusso then carried on with further descriptions of the building, noting that with a designed 14 tenants, the building would be eligible for 560 square feet of signage and gave details of the initial distribution of the signage square footage. (T at 38, ll. 12 - 20.) Mr. Colarusso also mentioned briefly the window treatments which would continue the French theme of the overall design of the building. (T at 38, ll. 20 - 24.)

Mr. Colarusso then reiterated Mr. Cocron's testimony that part of the difficulty in finding tenants for the building was the state of disrepair of the adjacent Borough parking lot and tendered photographs of the parking lot. (T at 39, ll. 2 - 10, R at A6). Mr. Colarusso made similar comments with respect to the condition of a small grassy plot owned by the Borough and the presence of a bus stop with its attendant problems. (T at 39, l. 22 - 40, l. 6.) Mr. Colarusso further indicated Petitioners' willingness to undertake improvements to this municipal infrastructure at Petitioners' expense. (T at 40, l. 7 - 41, l. 14.)

Mr. Colarusso then commented briefly on lease rates (T at 41, ll. 15 - 24), and then spoke to the sign variance request that was part of the variance request to permit the adult cabaret. With the fewer number of tenants (the gymnasium on the third and fourth floors, the adult cabaret on the second floor and the restaurant on the first floor, the allowable signage area would be reduced to 60 square feet, compared to 560 square feet allowable based on a configuration of 14 tenants. Thus, Petitioners requested a further variance to permit 400 square feet of signage. (T at 41, l. 24 - 42, l. 16.)

Petitioners' next witness was R. Bruce McLaughlin, a well qualified land use planner and an expert in Adult Use issues. Mr. McLaughlin began his presentation by submitting for the

record his resume, a supplemental resume dealing with his Adult Use experience, and a four year testimony list prepared in response to the requirements of Rule 26, Fed.R.Civ.P. (T at 43, ll. 6 - 22, R at A7.) Mr. McLaughlin then provided a brief oral summary of his experience. (T at 43, l. 24 - 45, l. 2), including the fact that he has done work on the issue of alternative avenues of communication for various local governments. (T at 44, ll. 5 - 18.)

Mr. McLaughlin then began the substantive part of his presentation by noting that the Borough's adult use zoning regulations (Exhibit B), have a 30% threshold below which a land use is not considered to be an Adult Use. Mr. McLaughlin hypothecated that if the building were developed as a single land use, there could be 5,400 square feet of adult material without any approvals whatsoever from the Borough. (T at 45, ll. 3 - 12.)

Mr. McLaughlin then reviewed the history of adult use zoning regulations, and the myth perpetrated by the City of Detroit – without any evidence whatsoever – that these uses cause unusual or unique "adverse secondary effects." He further pointed out that subsequently an Assistant City Attorney for Detroit noted that the Plaintiffs in *Young v. American Mini-Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440 (1976) focused on the prior restraint issue, and not on the adverse secondary effects issue. Mr. McLaughlin further noted that some of the material in the Detroit record was very similar to literature on the "adverse secondary effects" of racial integration. (T at 45, l. 13 - 46, l. 17.)

Mr. McLaughlin then explained, with an illustration, the social science phenomenon by which so many Adult Use "studies" could reach the same, but erroneous conclusion. (T at 46, l. 21 - 47, l. 15; R at A8.) Mr. McLaughlin further explained the history of the Adult Use studies, noting first that the 1977 Los Angeles study found no empirical evidence of adverse secondary effects on property values; (T at 47, ll. 16 - 20); and then describing the two studies done in St.

Paul, Minnesota in 1978, where the first study, with a state agency as the lead author, stated 14 times that there was no evidence of harm caused by sexually-oriented Adult Uses. (T at 48, ll. 1 - 9.)

Mr. McLaughlin then noted that the local government studies are far from unanimous and presented the Board with a document containing the contradictory and inconclusive findings of those studies. (T at 48, l. 18 - 49, l.11, R at A9.) He then added a finding omitted from the document:

> And there's one finding that needs to be added to that document. It's from a publication by the American Planning Association, which is the body that planning board members or professional planners belong to. The document is by Eric Damian Kelly and Connie Cooper, both of whom are fellows [*sic*] of the American Institute of Certified Planners, the professional organization of planning which is the equivalent of licensing in all but New Jersey and Michigan. And the document's entitled, Everything You Always Wanted to Know About Regulating Sex Businesses, XXX. It's an American Planning Association Planning Advisory Service Report 495/496 Chicago in the year 2000.
>
> ...At page 135 of that document, and the page number is a little bit off in the document, but you'll be able to find them, Dr. Kelly and Ms. Cooper say, as a matter of fact, there is a good deal of evidence that impacts on the primary [*sic*, crime] and on property values are minimal for a single, well-managed sexually oriented business separated from other such businesses. Well, as you can see from the presentation on the interior design, there's every indication that this is going to be a well-managed business. It's certainly separated from other adult uses and it's a single — it would be a single use by itself. So in the document that you've been handed, you'll see other findings that show the true effect or lack of effect of adult uses. (T at 49, l. 13 - 50, l. 16.)

Mr. McLaughlin then described and offered for the record several local government studies which were generally intended to find adverse secondary effects unusually attributable to sexually-oriented Adult Uses but which did not do so, including Evansville, Indiana, (T at 50, l. 17 - 52, l. 7, R at A10); one of an annual series of Consultation Reports done in Arlington,

Texas, (T at 52, l. 18 - 55, l. 7, R at A 11); and Fulton County, Georgia, (T at 55, l. 8 - 57, l. 6, R at A12 and A13). Mr. McLaughlin also tendered a summary of his own analyses of adverse secondary effects, (T at 57, l. 15 - 58, l 10, R at A14), which also demonstrated a lack of adverse secondary effects. Mr. McLaughlin then concluded this part of his presentation with a brief discussion of different types of adult cabarets and offered an exhibit describing upscale cabarets such as that proposed by 10. (T at 58, l. 11 - 59, l. 20, R at A15).

Mr. McLaughlin then spoke of the regional attraction nature of an adult cabaret and that at least one person working for local governments describes customers of Adult Uses coming from a "wide catchment area." (T at 59, l. 22 - 60, l. 11.) He also described adult cabarets in downtown locations, mentioning Minneapolis, Seattle and the closely comparable situation in White River Junction, (Town of Hartford), Vermont. (T at 60, l. 16 - 61, l. 18.)

Mr. McLaughlin then described some of the present problems with the area of the building and predicted that the combined proposed uses of the building will have a synergistic effect and will be an impetus for downtown growth. (T at 61, l. 19 - 62, l. 10.) Mr. McLaughlin finally noted the distances between the proposed adult cabaret and the "sensitive" land uses "protected" by the Borough's adult use zoning regulations. (T at 62, ll. 10 - 21.)

Mr. McLaughlin then reviewed the variance criteria set out in the Borough's Zoning Code ( R at VC). He began by quoting a Pennsylvania Supreme Court case describing the variance process as an "escape valve" necessary to preserve the constitutionality of Zoning Ordinances. Mr. McLaughlin's testimony was as follows:

> Now, with respect to criteria one and three of your code, that there are unique physical circumstances or conditions, including, I would add, but not limited to certain physical features, and the hardship is not self-created. Zoning ordinances, particularly in Pennsylvania, are strictly construed in favor of the land owner and against the government. Thus, the use of including means that what we are describing falls within the

broad language of the ordinance. The ordinance also uses the disjunctive or so that the unique conditions are not limited to physical conditions, but to any unique conditions.

The hardship is simple. There are no sites anywhere in the borough where an adult use can locate. We've looked at your zoning map. We've applied using a property line measurement, the segregation requirement of your code, and there is no place that is zoned for an adult use that meets the segregation requirement using the property line measurement, which is the proper measurement to use.

Further, the I-1 and I-2 zones are not part of the relevant real estate market. They're not suitable for some or any generic commercial use. And the cabarets are not — are only permitted in areas that are not part of the relevant real estate market. As I said, my testimony from the affidavit in Philadelphia carried today [*sic* the day] on this point as it has elsewhere. And the hardship is created by the ordinance and not by the applicant. The hardship also arises from the unique circumstances of downtown, the lack of tenants, existing tenancy problems in the downtown, like the vagrant we saw this afternoon, which will be cured by the active use of the building.

Because of the unique conditions of the market and the location, there is no other reasonable use of the property, as you've heard from the realtor's testimony. The variance will not result in an alteration to the character of the neighborhood. There will be no adverse secondary effects. There will be no adverse impact on the area. In fact, as I've said, the use is likely to serve as a catalyst to renew the area, thus further serving public welfare. And obviously, we're seeking the minimum variance necessary to permit the reasonable use of the property. (T at 63, l. 1 - 65, l. 2.)

In his testimony, Mr. McLaughlin, although identifying only criteria 1 and 3 by number, did, in fact, deal with five criteria for the granting of a variance by the Morrisville Zoning Hearing Board. ( R at VC.) Each and every criterion was addressed, and Mr. McLaughlin's sworn testimony provided the **only** evidence, let alone competent, substantial evidence, on which the Board could base its decision.

Mr. Colarusso then presented several letters in support of the application, and reemphasized the regional attraction of the various uses proposed for the building. (T at 65, l. 15

- 66, l. 17.) He further identified the amount of thought that went into pursuing this proposal, and some of the details that had been discussed. (T at 66, l. 18 - 67, l. 20.)

Mr. Colarusso then introduced the alternate variance request, stating:

> ...We have come up with an alternative variance request. This alternative variance request would allow us to bring in the fitness center on the third and fourth floor. It would enable us to invest in the pocket park and the bus stop as depicted on the rendering. It would not, however, enable us to repair the parking lot. It may very well enable us to help attract a restaurant. And what that alternative variance request would call for would be simply a signage variance. I have an explanation of alternative variance requests for the Morrisville Zoning Board from Stockham Interests, LLC that I would like to — I'm sorry, they're not stapled. I apologize. Two pages each.
>
> Now, this particular alternative variance request is not going to make the gentleman in the first row very happy, because I won't sign his lease at this point he's granted. What we are calling for is very simply a couple of sign variances. As mentioned before, the text in your ordinance is, or the requirement or the allowance of the ordinance is 40 square feet per tenant. Without bringing the club onto the second floor, we would retain the nature of the multi-tenanted aspect of that second floor, so the reduction in tenancy would be less. We would still be looking to do the third and fourth floor as a fitness center, which would reduce those two floors for one tenant. We would have the restaurant and we would have two or three other users or tenants on the first floor.
>
> A building of 18,700 and some odd square feet, utilizing the density that's on the second floor and averaging 615 square feet, give or take, per tenanted space will allow for 30 tenants in this building. If we were able to have 30 tenants in this building, that would be 1,200 square feet that would be allowed in signage, 30 times 40. What we are requesting is an off premises sign variance for what is defined in your ordinance as a billboard. It is approximately a 1,000-square foot billboard. We would be looking for an additional 200 square foot for allowable signage to accommodate the other tenants, i.e., a restaurant, the existing barber shop and some other shops on the first floor.
>
> The reason we are interested in the billboard and the reason we are willing to forego the other application and not pursue that other application is that this will satisfy the goals that we as the building

37

owners have. We have a very simple goal, and that is to be able to invest in the building the capital required to bring it up to standard and to be able to attract viable tenants and to have those tenants have an economically viable business.

Why does the billboard do that? It does that in a couple of manners. Number one, what we propose is if we are granted the variance to put the billboard on the building, we will offer the fitness center a period of time, three months, four months, six months, whatever it may be, to utilize that billboard. So if they open up a brand new club there, it will help them attract business, not having the regional attraction of the second floor use that seems to have created so much controversy.

That would also be offered that same offer if we had — I'd like to go back to one of the other restaurateurs that we were speaking that also came back to us with the same answer that Mr. Vartuke had, and that is the area is not going to support my restaurant there, there's a couple of restaurants in the area and it's too long of a haul, too much risk. If we were to offer him the billboard for a period of time, he may change his mind.

So that's the very obvious benefit to the tenants. As the building owner, the benefits to us obviously would be that we would have tenants that would be attracted to the building A, and B, that would be able to sustain their businesses due to the enhanced exposure.

Number two, after we help stabilize those new tenants in the building, it will give us an additional source of revenue. An additional source of revenue would offset the loss of the rather attractive lease that we had for the first and second floor. The next benefit that we would have as the building owner would also be a benefit to the town in general, and that is it would allow us the ability to construct this pocket park and this bus stop, with the township committee's approval, of course, to improve municipal property. We would be able to utilize the revenues from that sign to borrow the money to be able to put in that improvement and we would be willing to do that.

The obvious benefits to the town, again, the pocket park, the bus stop. Your citizens wouldn't be huddling in our doorway in a rainstorm. Certainly a bus kiosk would be a much more comfortable and desirable way to wait for their transportation. And I guess the biggest, although I don't necessarily agree that this is a benefit to the town, but if the Zoning Board were to approve this variance, we would immediately hereby withdraw the other

variance requests and we would agree not to appeal. (T at 67, 1. 23
- 71, 1. 25.)

Although Mr. Colarusso did not address the variance criteria ( R at VC), one by one, his testimony certainly showed that the alternative variance request complied with those criteria. The most compelling part of Mr. Colarusso's testimony was when he noted that the building, fitted out as a multi-tenant facility would be entitled to a patchwork of approximately 30 signs occupying 1,200 square feet, compared to the requested single sign of 1,000 square feet and an approximate additional 200 square feet of signage for tenants. (T at 69, 11. 4 - 17.) From any perspective, since the square footage would be about the same, the variance request made infinitely more sense than what might now be allowed by law.

Petitioner, Stockham's last witness was Michael Bense, the sign contractor who would install the signage had the variance been granted. Mr. Bense described the type of sign proposed, showed examples of that type of sign from around the country, and offered a sample of the material that would be used for the sign. (T at 72, 1. 8 - 76, 1. 9.)

Mr. Colarusso then summarized the Petitioners' desires in seeking the variances:

> ... And again, I would just like to reiterate that our main objective
> is to be able to revitalize the Stockham building and the
> surrounding area and to be able to attract tenants and to make the
> building economically viable, because obviously right now it is
> not. It is deteriorating because of our inability to reinvest in the
> building. And we just need some assistance here with one of these
> variances. (T at 76, 11. 14 - 21.)

After a recess which did not appear to include any off-the-record discussions, the Zoning Hearing Board resumed the hearing with a question of Mr. Colarusso as to the exact nature of the adult entertainment to be offered. Mr. Colarusso replied that the adult entertainment would entertainment that falls within the definition of "adult entertainment" in the Morrisville zoning ordinance, albeit with a "French flair." (T at 77, 1. 3 - 79, 1. 2.) The Board then posed some

questions about the technical aspects of the proposed signage, which were answered. (T at 79, l.

13 - 81, l. 8.)

Mr. Kenner of the Board then posed a question of Mr. McLaughlin on the topic of

alternative avenues of communication:

> MR. KENNER:
> You made reference to our present adult entertainment zoning?
> MR. MCLAUGHLIN:
> Yes, sir.
> MR. KENNER:
> And what did you say were the drawbacks or the ---?
> MR. MCLAUGHLIN:
> Well, your code doesn't indicate a measurement point. And I've
> done a peer-reviewed paper that — and peer-reviewed not in the
> academic sense, but it's been reviewed by other professionals, that
> has conclusively established that you would use a property line to
> property line measurement in the absence of a measurement point
> being specified. And when you do that and you apply the 1,200 —
> 2,000 feet from Sugar and Spice and 500 and — just that alone, or
> the 500 feet from the residential zoning districts on either side of
> the I-1 and I-2 district, by geometry, there is no place where an
> adult use can locate. And then if you get beyond that, you're
> looking at a forest and part of the Amtrak area, which is also not
> part of the relevant real estate market, not suitable for some generic
> commercial use. So the hardship is created by the provisions of the
> code rather than anything the Applicant has done. And it's pretty
> clear that this isn't the [there isn't any] place where an adult use
> can open and operate right now in the borough. (T at 81, l. 11 - 82,
> l. 19.)

Mr. Colarusso and the Board's attorney and members than did some "housekeeping" with

respect to exhibits and the precise nature of the variance request and the alternate variance

request, (T at 82, l. 22 - 86, l. 2.) With respect to the precise content of the proposed wallscape

sign, *vis a vis* prospective tenants, Mr. Colarusso clarified the Petitioners position:

> MR. COLARUSSO:
> We would make — that's a good point for clarity. Let me clarify
> that. We would make the offer to the prospective fitness club to
> utilize that advertising space free of charge for a period of time.
> That would be our first inclination to do that. We would also make

a similar offer. We would circle back to one of the restaurateurs that had declined on the space, ask them if this makes a difference. If it does, we would give them a similar offer upon opening, prior to opening, during opening, whatever. For a several-month period, they would have the free advertising.

MR. FRIGERIO:
And the signage then would not necessarily be just for the fitness club, per se. It would also be offered to the restaurant?

MR. COLARUSSO:
That's correct. If we're talking about the wallscape, yes. It would be offered free of charge to the fitness club and any other retailer. Also, I was remiss in pointing out that we would be --- we would be willing to give the downtown merchants — we would work this out with Mr. Bense and Street Smart. We would really be, in essence, putting him in charge of the advertising of that. We would be contracting with his company to do that. We would ask that we give the downtown Morrisville business establishments priority. So if, for instance, the cigar shop wanted to advertise on the wallscape and the Gap came along, we would defer to the cigar shop at equal dollars. (T at 86, l. 3 - 87, l. 9.)

There was then further discussion of the technical details of the sign, (T at 87, l. 10 - 89, l. 24), and then discussion of the status of the elevator and stairs as well as of the structural capabilities of the building. (T at 90, l. 1 - 91, l. 11.)

Then a Board member, Mr. Frigerio, asked for clarification as to the "trade-offs" with the sign variance application:

MR. FRIGERIO:
I understand that in the first application you had this French theme. In the second application are you still continuing with that French theme in terms of the presentation of the building?

MR. COLARUSSO:
The first and second floor uses, theme and all, go away.

MR. FRIGERIO:
Okay.

MR. COLARUSSO:
We are down to a blank slate on the first and second floor with, again, the promise that it won't be adult entertainment. It will either be a conforming use, in which case we will get the proper COs from your code official, your zoning official. And if it is another nonconforming use, not adult entertainment related, we will be

back before this Board with a request to put them in. (T at 91, l. 12 - 92, l. 5.)

After a question from the Board Attorney about the sign variance, there was an exchange between the Board Chair and Mr. Colarusso which concluded with the following clarification by Mr. Colarusso:

> Let me clarify that. I apologize if that came across when I said that. This alternative, as a matter of fact, avoids the hodgepodge that you just described and that was kind of on the building prior. And you can see a couple of empty brick — unpainted brick spots still on the building and an old sign way up high.
>
> ...
>
> If we were to cut this building into 30 different units, we would be allowed to put, and I believe Mr. Seward, correct me if I'm wrong, 30 signs of 40 square feet each and have that hodgepodge or, you know, quilt effect on the side of that building.
>
> ...
>
> In its current makeup, we could have 14 signs of 40 square feet plastered on the side of that building. What we're asking for here, and we would certainly agree to limit the signage on the side of that building, to, if not the two that you see there, maybe one smaller directory sign on the side of the building below it pointing toward the entrance or pointing toward one of the first floor retailers. But there would be no more than three signs on the side of that building, and the third one being fairly inconspicuous. (T at 93, l. 19 - 94, l. 22.)

After further discussion about the details of the sign, and questions about security that would be provided for the adult cabaret, (T at 94, l. 24 - 99, l. 9), the Board opened the hearing to the public.

The public comments made to the Board were almost entirely without any evidentiary value whatsoever, let alone comprising "competent, substantial evidence." The majority of the

comments fell into one of several categories and will generally be grouped accordingly in this Statement of Facts with the first or predominant concern used for the categorization.

Requests for Clarification and Responses

Ms. Jones (T at 99, l. 18 - 103, l. 21); Ms. Millionis, (T at 103, l. 22 - 104, l. 21).

Moral Objections to the Adult Entertainment

Father Eckerd, (T at 104, l. 24 - 105, l. 18); Mr. Gabriel, (T at 113, l. 12 - 114, l. 7); Mr. Sanders, (T at 114, l. 9 - 115, l. 25); Ms. Jones, (T at 116, ll. 13 - 21); Ms. Huling, (T at 117, l. 6 - 118, l. 3); Ms. Billett, (T at 123, ll. 11 - 21); Mr. Taylor, (T at 124, l. 6 - 129, l. 7); Mr. Wilcox, (T at 129, l. 16 - 130, l. 19); Ms. Taylor, (T at 136, l. 1 - 138, l. 8); Ms. Petro (T at 142, ll. 13 - 24); Ms. Hallak, T at 146, l. 15 - 147, l. 6).

Concerns About Secondary Effects

Ms. Runner (T at 106, ll. 4 - 24).

Moral Objections to the Potential Content of the Sign

Ms. Millionis, (T at 108, l. 12 - 113, l. 4); Council Member Burger, (T at 122, ll. 14 - 16).

Support for the Sign Variance

Ms. Sesar (T at 118, l. 14 - 119, l. 1); Ms. Petroff, (T at 122, l. 23 - 123, l. 7); Ms. Hughes, (T at 134, l. 6 - 135, l. 20); Ms. Persico, (T at 143, l. 8 - 144, l. 25).

Absence of Adult Use Sites

Ms. Burger (member of the Borough Council), (T at 119, l. 9 - 120, l. 11).

Concern About Potential for an Adult Bookstore

Ms. Ledger, (T at 130, l. 23 - 131, l. 22).

Concern about the Condition of the Building

Ms. Vacarro (T at 138, l. 12 - 141, l. 15); Ms. Schell, (T at 145, l. 5 - 146, l. 12).

One member of the public, (Rev. Taylor), had questions for Mr. McLaughlin, as follows:

MR. TAYLOR:
One question was the — you talked — I want a clarification of the code. You talk about the code that we currently have. And you said there's no place, something in the industrial section where it could be and you said except for two locations. You gave those locations but they're not available for rental at this point in time. Are you saying there is absolutely no square footage place in the entire borough which meets the regulations?

MR. MCLAUGHLIN:
That's correct. If you use a property line to property line measurement, which is the appropriate measurement if it's not specified in the code, 2,000 feet from Sugar and Spice and 500 feet from the residential zones — and residential uses are also a disqualifier. And there is a house west of the residential zone in the commercial zone on the same side as the industrial that would extend the disqualifier, too.

MR. TAYLOR:
I thought you said except for — you gave two locations. What would those have been?

MR. MCLAUGHLIN:
Two zones. The I-1 and I-2 zones nominally permit adult uses. But when you apply the segregation requirement, you just hit the nail on the head. When you apply 500 feet or even something less, nothing — no entire property falls beyond the segregation requirement.

MR. TAYLOR:
You're saying that one house is the house in question?

MR. MCLAUGHLIN:
No. The 2,000 feet from Sugar and Spice is the main effect, the main disqualifier. The residential zones to the north and south, plus the one house further west, add to that. They pile on it.

MR. TAYLOR:
I have two other questions. You've brought us some studies. Did any of your studies or tests show client crime? You said there's client crime at the location. Do any of your studies talk about client crime once the person left the location, went back to their home or place of record?

MR. MCLAUGHLIN:
By client crime, you mean a patron of the adult use?

MR. TAYLOR:
Correct. That saw this and then went back to their home. Does any of your studies say that there's — address the crime or whatever at that person's —?

MR. MCLAUGHLIN:

That hasn't arisen in any of the planning literature, may have arisen
in some of the sociology literature, but it hasn't —
MR. TAYLOR:
You said adverse effects. I just wanted to clarify, the other one
was, do any of your studies talk about adverse effects to the
family?
MR. MCLAUGHLIN:
No. Again, that may arise in the sociology literature, but not in the
planning literature. (T at 125, l. 8 - 127, l. 22.)

Of all the public comments, the ones with any evidentiary value were those of Ms.

Burger (a member of the Borough Council), who noted that even with a 50 foot segregation

requirement, there would be no place for adult entertainment in the Borough, (T at 120, l. 23 -

121, l. 6) or even a 12 foot segregation requirement (T at 132, ll. 6 - 12); and Ms. Runner's

comments (T at 106, ll. 8 - 10), that there are already prostitution and drug problems in the area.

At the conclusion of the public comments, the Board caucused with its Attorney and the

Zoning Official at the council table.[1] After the caucus, the meeting was reconvened, and three

motions were made, seconded and approved. The first was a procedural motion allowing

Petitioners to amend their application. (T at 147, l. 18 - 148, l. 11.)

The second motion was to deny the use variance to permit adult entertainment, (T at 148,

l. 14 - 149, l. 4), and a third motion to deny the sign variance. (T at 149, ll. 8 - 23.)

There was no discussion by the Board on the record of the reasons for their decisions; the

Board made no findings of fact and reached no conclusions of law.

Of course, the Board could not make legitimate findings of fact or reach legitimate

conclusions of law because there was not one iota, one scintilla of evidence to support its

decisions. Not only was there no competent, substantial evidence in support of the Board's

decisions, there was no evidence whatsoever to support those decisions.

---

[1] An effort to determine the exact length of the caucus will be made through discovery.

## D. NATURE OF RELIEF SOUGHT

Petitioners request this Honorable Court to conduct an on-the-record review of the relevant proceedings before the Morrisville Zoning Hearing Board and to quash the decisions of the Board denying the original variance applications and the alternative variance application, and to remand this matter to the Board for an adjudication consistent with the ruling of the Court.

## E. SUMMARY OF ARGUMENT

The Morrisville Zoning Hearing Board manifestly abused its discretion in denying Petitioners' variance requests.

The Board did not base its decisions on **any** evidence whatsoever, let alone competent, substantial evidence.

The Board failed to provide Petitioners with substantive and procedural due process.

## F. ARGUMENT AND CITATIONS OF AUTHORITY

## F.1. ZONING AND VARIANCE FRAMEWORK

Zoning Ordinances have long been considered to be a valid exercise of the local government police power in Pennsylvania: *Ward's Appeal*, 289 Pa. 458, 137 A. 630, (PA 1927). However, zoning ordinances are to be strictly construed in favor of the landowner and against the government: *Relosky v. Sacco*, 514 Pa. 339, 523 A.2d 1112 (Pa. 1987); *Gilden Appeal*, 406 Pa. 484, 178 A.2d 562, (Pa. 1962). In *Fidler v. Zoning Board of Adjustment*, 408 Pa. 260, 182 A.2d 692 (Pa. 1962), the Court stated:

> It is fundamental that restrictions imposed by zoning ordinances are in derogation of the common law and must be strictly construed: *Rolling Green Golf Case,* 374 Pa. 450, 97 A.2d 523 (1953); *Lord Appeal,* 368 Pa. 121, 81 A.2d 533 (1951); and, *Medinger Appeal,* 377 Pa. 217, 104 A.2d 118 (1954). Such restrictions must not be so construed as to fetter the use of land by implication. The permissive widest use of the land is the rule and

not the exception, unless specifically restrained in a valid and reasonable exercise of the police power. 408 Pa. At 265

However, in order to be constitutional, zoning ordinances must have an "escape valve:"

> ... To preserve the validity of the zoning ordinance in its application to the community in general, therefore, the variance provision of the enabling act functions as an "escape valve" so that when regulations that apply to all are unnecessarily burdensome to a few because of certain unique circumstances, a means for relief from the mandates of the ordinance is provided. See *Pierce v. Zoning Board of Adjustment*, ... 189 A.2d 138, 141, (1963); *Colligan Zoning Case*, ... 162 A.2d 652, 655 (1960). ..." *National Land and Investment Company v. Easttown Township Board of Adjustment*, 215 A.2d 597 (Pa. 1965).

"Use variances," although illegal in some states, are permissible in Pennsylvania as part of the "escape valve:" *Arter v. Philadelphia Zoning Board of Adjustment*, 916 A.2d 1222 (Pa. Cmwlth. 2007); *Pyzdrowski v. Pittsburgh Board of Adjustment*, 437 Pa. 481, 263 A.2d 426 (Pa. 1970).

## F. 2. STANDARD OF REVIEW

The standard of review for a decision by a Zoning Hearing Board is whether the Board created a "manifest abuse of discretion:" *Lamar Advertising v. Zoning Hearing Board*, 939 A.2d 994, Pa. Cmwlth. 2007). The **complete absence of any evidence** to support the Board's decisions shows that it did, as a matter of law, commit a manifest abuse of discretion.

## F. 3. ARGUMENT

The standard for granting a variance has been stated as follows:

> Generally, in order to obtain a variance, a landowner bears the heavy burden of proving that he suffers from an unnecessary hardship, which hardship is unique or peculiar to the property and not self-imposed, and that granting the variance will not adversely affect the public heath, safety, and welfare. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983); *Bruni v .Zoning Hearing Board of Plymouth Township,* 52 Pa. Cmwlth. 526, 416 A.2d 111 (1980). ...

Nevertheless, the law is well settled that a variance will not be granted solely because the applicant will suffer an economic hardship if he does not receive the same. *See Sotereanos v. Zoning Board of Adjustment of the City of Pittsburgh,* 711 A.2d 549 (Pa. Cmwlth.), petition for allowance of appeal denied, 556 Pa. 699, 727 A.2d 1125 (1998).

Although the economic viability of the building was a part of the presentation, Mr. McLaughlin's testimony – the only competent, substantial evidence before the Board – clearly established the Petitioners' compliance with all five criteria for granting the adult entertainment use variance. Mr. McLaughlin described the unique hardship of the absence of any location in the Borough where an Adult Use could open and operate; he pointed out that this hardship was created, not by actions of the Petitioners, but by legislation adopted by the Borough; that granting the variance was necessary to permit the reasonable use of the property; that granting the variance would not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and that the variance requested was the minimum variance necessary to achieve the desired reasonable use of the building.

In *North Chestnut Hill Neighbors v. Zoning Board of Adjustment*, 928 A.2d 418 (Pa. Cmwlth 2007), the Court agreed with the Zoning Board and the trial court that there was sufficient evidence to sustain a variance with respect to the hardship and public interest criteria, but that the Board failed to make findings as to whether the requested variance was the minimum necessary to achieve the desired results, and whether certain technical matters had been properly addressed. In the instant case, there is **no evidence** to oppose the granting of the requested variances. Even if the Board ultimately issues findings of fact (which it has not done as of the filing of this Complaint), there is nothing in the record before it that would justify its decision.

*Wilson v. Plumstead Township Zoning Hearing Board*, 894 A.2d 845 (Pa. Cmwlth 2006) is instructive because the Zoning Hearing Board had before it evidence from the Township's Zoning officer that the subject property could be put to a reasonable use without a use variance. Likewise, in *Laurel Point v. Susquehanna Zoning Hearing Board*, 887 A.2d 796 (Pa. Cmwlth 2005), the local government introduced evidence in opposition to the requested use variance from "an expert in project development and traffic," and from the Township's Zoning Officer. In the instant case, again, there was no such evidence, from the Borough's zoning official or from anyone else.

*Candela v. Millcreek Township Zoning Hearing Board*, 887 A.2d 335 (Pa. Cmwlth 2005) is also instructive because in that case, the objector to the variance, a neighboring property owner: "offered no evidence in support of his assertions, and no evidence to rebut that offered by Waldameer Park [the applicant for the variance]". Although there were other, complicating factors, both the Court of Common Pleas and the Commonwealth Court upheld the granting of the variance based on the lack of evidence in opposition to the application. The instant case is similar in that there was no evidence whatsoever to support the denial of the variances.

In 2005, the Commonwealth Court reversed the affirmation of a variance, holding:

> It may well be that Seate needs the garage and that he will suffer a professional hardship in its absence. [footnote omitted] It may also be the case that the character of the neighborhood will be unaffected by the addition of the Intervenors' garage. We may not, however, consider these facts in evaluating the validity of the variance because they are not in the record. The Board members appear to have drawn on their personal knowledge of Seate and of the neighborhood, but this knowledge is not a valid substitute for evidence of record. Intervenors were required to place this evidence on the record, assuming its relevance to hardship, and they failed to do so. *Doris Terry Revocable Trust v. Zoning Board of Adjustment of Pittsburgh*, 873 A.2d 57 (Pa Cmwlth 2005).

If the Morrisville Zoning Hearing Board ultimately issues findings of fact, any findings supporting its decisions will not come from the record before it. Thus, they do not support the denial of the variances nor do they overcome Petitioners' uncontroverted evidence of compliance with all five variance criteria.

In a closely analogous case, the Court effectively anticipated Mr. Colarusso's testimony about the nature of the building and the issues with its rehabilitation:

> To show unnecessary hardship an applicant must prove that either: (1) the physical features of the property are such that it cannot be used for a permitted purpose; or (2) the property can be conformed for a permitted use only at a prohibitive expense; or (3) the property is valueless for any purpose permitted by the zoning ordinance. *SPC Co., Inc. v. Zoning Bd. of Adjustment of the City of Phila.,* 773 A.2d 209 (Pa. Cmwlth. 2001). The applicant must show the hardship is unique or peculiar to the property as distinguished from a hardship arising from the impact of zoning regulations on the entire district. *Laurento v. Zoning Hearing Bd. of the Borough of West Chester,* 638 A.2d 437 (Pa. Cmwlth. 1994). Mere evidence that the zoned use is less financially rewarding than the proposed use is insufficient to justify a variance. *Id.* Where a condition renders a property almost valueless without the grant of a variance, unnecessary hardship is established. *Society Created to Reduce Urban Blight v. Zoning Bd. of Adjustment of the City of Phila.,* 787 A.2d 1123 (Pa. Cmwlth. 2001); *Laurento; Serban v. Zoning Hearing Bd. of Bethlehem,* 480 A.2d 362 (Pa. Cmwlth. 1984). *North Bethlehem v. City of Bethlehem*, 822 A.2d 840 (Pa. Cmwlth 2003).

Here, however, Petitioners had an additional hardship – the total absence of any site in the Borough where they could open and operate their adult entertainment establishment. Thus, the Board had before it the unrebutted of Mr. Colarusso, as to the financial issues with the building, and the evidence of Mr. McLaughlin, corroborated by a Member of the Borough Council, that there was no place in the Borough where an Adult Use could open and operate; so two separate and distinct hardships were established without refutation on the record before the Zoning Hearing Board.

Thus the Morrisville Zoning Hearing Board had before it unrebutted, competent, substantial evidence that there were unique hardships associated with the building – the fact that rehabilitating the building to conforming uses would be prohibitively expensive, and that there was no place in the Borough where an adult entertainment establishment could open and operate.

The Board also had evidence before it that the hardships were not self-created; the former being caused, in part, by the state of disrepair of the nearby municipal infrastructure; the latter being created by the Borough's regulations. The Board also had before it unrebutted, competent, substantial evidence, that granting the adult entertainment variance would not alter the essential character of the neighborhood, that it would not adversely impair the appropriate use and development of nearby properties and that it was the minimum variance necessary to permit the reasonable use of the building.

Accordingly, the Morrisville Zoning Hearing Board manifestly abused its discretion; did not base its decisions on any evidence, let alone competent, substantial evidence, and failed to provide Petitioners with substantive or procedural due process. Accordingly, the Board's decisions must be reversed and this matter remanded to the Board for an adjudication consistent with the opinion of this Court.

Respectfully submitted,

_____
Date

Joseph Beller, Esquire, P.C.
Pennsylvania Bar Number 02640
Suite 1032, Two Penn Center
1500 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19102
Telephone:     (215) 972-8008
Co-Counsel for the Plaintiffs/Petitioners

And for

Luke Lirot, Esquire
Florida Bar Number 714836
Luke Charles Lirot, P.A.
2240 Belleair Road, Suite 190
Clearwater, Florida 33764
Telephone:     (727) 536-2100
Facsimile:     (727) 536-2110
Co-Counsel for the Plaintiffs/Petitioners
Subject to Admission *Pro Hac Vice*